

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00067-CR

_____

BRENDAN XAVIER DOUGLAS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 41,780-B

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

A Gregg County jury found Brendan Xavier Douglas guilty of the May 15, 2012, capital murder of Deandre Rossum, and the trial court sentenced him to the mandatory punishment of life imprisonment without parole.[1]  In his appeal to this Court, Douglas asserts that there was legally insufficient evidence to convict him of capital murder and that the trial court erred (1) in failing to suppress his out-of-court statement to Detective David Cheatham, (2) in admitting his out-of-court statements made to three other officers, (3) in admitting his out-of-court statement made to his former girlfriend, and (4) in failing to suppress evidence obtained from the search of his cell phone. We find that there was sufficient evidence to convict Douglas of capital murder and that Douglas failed to preserve his asserted errors complaining of the admission of evidence obtained from a search of data on his cell phone and of his statement to Detective Chris Taylor. We also find that the trial court did not abuse its discretion in admitting the statements made by Douglas to his former girlfriend, to Cheatham, and to two other officers. Since we find no error, we affirm the judgment of the trial court.

## I.    The Evidence at Trial

On the day of the shooting, Rossum used his girlfriend's orange and black, two-door Mitsubishi to drive his friend, Robert Don Perry, to look for a job, to see his uncle, and then to a McDonald's restaurant in Longview. Perry testified that Rossum picked up a third man, Elgin Jackson (nicknamed "L.J.,") before going to McDonald's and that Jackson joined them. After eating, Rossum made a telephone call, and a fourth man, Douglas, joined them. They began talking

---

[1]*See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03(a)(2), (b) (West Supp. 2015).

about drugs, and Douglas asked if he could go get a blunt[2] at Signal Hill Apartments. After going to Signal Hill, the four men drove to several places in Shreveport, Louisiana, in an unsuccessful attempt to purchase some "hard" or "butter."[3] After this failure and after having stopped over at a restaurant, the four returned to Longview. Perry testified that during this time, Douglas was texting, smiling, and laughing. Although they were supposed to be dropping Douglas off at a Burger King, Douglas said he wanted to return to Signal Hill, where he had gotten the blunt.

Perry testified that when they went to Signal Hill, Rossum got out of the car to allow Douglas to exit from the rear seat. Douglas then went up to the apartments and when he came back out, two men came from behind the building. Perry stated that Douglas and the two men came to the car, Douglas shook or bumped their hands, then took off running. The two men looked in the car, then guns started going off, and he saw Rossum fall down. The two men went through Rossum's pockets, after which one of them looked at Perry and said, "[G]et that nigger, get that nigger." Needing no further impetus, Perry exited the car and fled to a nearby E-Z Mart convenience store, where he called the police. After the police arrived on the scene, Perry returned and gave them a statement wherein he recounted his experience.

Jackson confirmed Perry's testimony regarding the events leading up to the shooting. He also testified that while they were waiting at Signal Hill Apartments for Douglas to return to the car, two men wearing hoodies and shorts approached the driver's side of the car. After they talked briefly with Rossum, Jackson heard a gunshot. The gunshot prompted Jackson to run away toward

[2] A "blunt" is a marihuana cigar, or a cigar packed with marihuana.

[3] "Hard" and "butter" are terms for crack cocaine.

3

the back of the car. Another shot struck Jackson in the back, and he fell to the ground where he was then shot several more times. Although Jackson could not see who shot him, he did hear Douglas say to one of the two shooters in a surprised manner, "Man, you shot me." Then he heard Douglas direct someone to "[s]earch his pockets," this instruction being followed by someone's hand going through Jackson's pockets and removing money as he laid on the ground, feigning death. When Jackson opened his eyes, he saw a light-colored Lincoln and heard it "burn out" (leave rapidly). A minute or so later, Jackson rose and saw Rossum leaning against the car, dead. Eventually, the police and an ambulance arrived on the scene, and Jackson (who had been shot in his back, side, thigh, and ankle) was taken to Good Shepherd Hospital where he spent almost two weeks recuperating. Jackson testified that Douglas often used his cell phone to text while they were in the car. On cross-examination, Jackson testified that he saw Douglas neither after he went up to the apartments nor when the shots were fired, but that he did hear him talking while giving directions.

Gabrina Ward (also known as Sabrina) testified that in 2012, she owned a cream-colored Lincoln and that she had given police permission to search it while it was at Good Shepherd Hospital. She testified that although she did not know her car had been taken, she did realize her keys were gone. She called Douglas to check on her car since he was a friend of her friend, Korvarsia Skinner, who had been at her apartment earlier that day. She said that she called Douglas about the missing car because, "that was the only person that I thought could have got it."

Officer Suzanne Hardee of the Longview Police Department testified that she was dispatched to Good Shepherd around 10:00 p.m. on the night of the shooting. At the hospital, she

4

found two shooting victims, Douglas and Jackson.  She testified that it is important to speak to shooting victims as soon as possible since their wounds may be life-threatening.  When she spoke with Douglas, she had no idea of his involvement as a participant in the shooting.  Hardee testified that even though she was then dressed in her police uniform (and, therefore, obviously with law enforcement), Douglas spoke to her willingly and that she did nothing to coerce or threaten him and did not offer him anything in return for his statement.  She said that at the time she spoke with Douglas, he was not handcuffed or in custody and that although he was then being treated for gunshot wounds, he did not appear to be under the influence of alcohol or drugs and was able to give coherent answers to her questions.  Hardee also testified that Douglas told her that he, Rossum, and two other black males had gone to Signal Hill Apartments to buy a blunt, that he had gone to an apartment, and that when he came back to the car, two black males approached.  He continued his story by stating that as he was getting into the car, he heard shots being fired, and Rossum fell.  He described the two men as thin, tall, and wearing dark-colored hoodies that covered their faces.  He did not indicate that he knew the two men.

Detective Jimmie Redmon of the Longview Police Department described the physical evidence collected at the scene, including .380 and 9 mm cartridge casings, three cell phones, fingerprints, and blood evidence.  In addition, he testified that buccal, or mouth, swabs from Deion Reed (Deion), Torry Reed (Torry), and Douglas were collected and sent to the Texas Department of Public Safety (TDPS) for DNA analysis.

Dr. John Anthony Stash performed the autopsy on Rossum.  He testified that Rossum suffered two gunshot wounds to the face and head.  One of the gunshots injured the skin, muscle,

5

and soft tissue inside the mouth, teeth, and tongue. The second gunshot injured the skin, muscle, soft tissue, and mandible, fractured two cervical vertebrae, and damaged the cervical spinal cord. Stash testified that the cause of death was two gunshots to the head and neck, although neither struck a major blood vessel. According to Stash, the bullet that hit the cervical spinal cord would have been rapidly fatal, possibly instantaneously. He also testified that he was able to recover both bullets from Rossum's body. On cross-examination, Stash testified that there was no gunshot residue or tattooing[4] on Rossum's body. He also testified that for there to be residue, the firearm would have to have been no more than six inches away from Rossum when it was discharged and that for tattooing to occur, the gun would have to have been no more than eighteen inches away.

Taylor testified that he was providing security for Good Shepherd Hospital on the night of the shooting. He recalled that one of the gunshot victims arrived by private vehicle and came through the front door, while the other was delivered by ambulance to the emergency room. As part of his job at the hospital, he talked with Douglas to determine where the shooting happened. Taylor testified that he did not place Douglas in custody or put handcuffs on him and that he neither photographed nor fingerprinted him, pointing out that he had no information at the time that Douglas was a suspect in the shooting. According to Taylor, Douglas was able to answer his questions coherently and did not seem intoxicated or under the influence of pain medications or other drugs. Taylor testified that Douglas told him that the shooting occurred at the E-Z Mart, but that he was not able to say which one. When he asked him who shot him, Douglas refused to answer and would not answer any more questions. On cross-examination, Taylor testified that he

---

[4]"Tattooing" is caused by unburned pieces of gunpowder striking the skin.

6

did not know if Douglas had been given pain medications when he talked with him and that the nursing staff was in the room while he questioned Douglas.

After Douglas refused to answer more questions, Taylor notified the central police dispatcher to send someone to assist him at the scene, and he located the vehicle that had brought Douglas to the hospital. Taylor testified that the vehicle was a Lincoln Town Car owned by Ward and that a bloody rag was lying next to it. He stated that before searching the vehicle, Ward's consent was obtained. The search of the vehicle revealed blood stains from the back seat, from the back of the driver's seat, from the dash near the front passenger seat, and from the front passenger seat. Taylor also testified that he collected evidence from the Mitsubishi driven by Rossum (the automobile in which Rossum and others were riding when they entered the grounds of the apartment complex where the shooting occurred). Among the evidence collected from the Mitsubishi were an iPhone and charger and the fingerprints of Jackson, Rossum, and Douglas.

Detective Kevin Freeman with the Longview Police Department assisted Cheatham at the crime scene and was assigned to go to the hospital to contact Douglas. Freeman testified that he made an audio statement of Douglas at the hospital as he was receiving treatment; at the time Douglas gave the statement to Freemen, he was in custody. Freeman testified that before taking Douglas' statement, he gave Douglas his *Miranda*[5] warnings and the warnings required by Article 38.22 of the Texas Code of Criminal Procedure,[6] after which he freely, knowingly, and intelligently waived his rights. Douglas did not appear to Freeman to be intoxicated, seemed to

---

[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]*See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West Supp. 2015).

understand Freeman's questions, and answered them accordingly. Further, Freeman related that Douglas was neither threatened, nor coerced, nor promised anything to induce him to make a statement. On cross-examination, Freeman acknowledged that Douglas was in a trauma room when he interviewed him, but he did not remember if Douglas was attached to an IV or any monitor at that time. He also stated that he did not know whether Douglas had taken any pain medications. He said that the officer at the door did not come in during the interview and that Douglas seemed comfortable talking with him.

The audio recording of Douglas' statement given to Freeman was played for the jury. In it, Douglas repeats the story he had previously given to Hardee, but he provided additional detail. In addition to the statement given to Hardee, Douglas expanded by stating that after he was shot, he ran to the street in front of the feed store, flagged down a car, and told the occupant that he had been shot. He then stated that the driver took him to the hospital. He said there was only one person in this car and denied knowing the identity of the driver. In addition, he denied being involved in any way in the shooting, knowing the identity of the shooters, having said anything at the time the shooting occurred other than to express that he had been shot, having a gun, or taking a gun with him the night of the shooting.

Trisha Kacer, a DNA analyst at the TDPS Crime Laboratory testified that the DNA profiles from the buccal swab of Douglas were consistent with those of the blood stains on the shirt found in the hospital parking lot and the blood stains found on the back seat and on the back of the driver's seat of Ward's Lincoln. In addition, Kacer testified that the DNA profile of the blood stain found in the front seat of the Lincoln was consistent with a mixture of Douglas' blood and at

8

least one other contributor. She also testified that the DNA profile from the swabbing of the front pocket of Rossum's pants was consistent with a mixture from Rossum, Torry, and at least one other contributor.

Dan Reigstad, formerly a detective with the Longview Police Department, assisted in searching a house at 104 Vesta Street in Longview.[7] Reigstad testified that they found a loaded semi-automatic AMT .380/9mm Kurz pistol (the AMT pistol) in a couch. They also found a number of cell phones, including one found on the same couch as the AMT pistol.

Wade Davidson Thomas, II, a forensic scientist with the TDPS Regional Crime Laboratory, testified that the bullet recovered from Rossum's spine was fired by the AMT pistol, as was a bullet removed from Douglas' body. In addition, based on his forensic examination of cartridges and cartridge casings recovered in the investigation, he opined that three firearms were involved in the shooting.

Cheatham led the murder investigation for the Longview Police Department. He testified that on the night of the shooting, he talked with Perry, Jackson, Douglas, and others. He also interviewed Douglas at the hospital on the morning of May 17, 2012. At that time, Douglas was in a private room, awake, clearheaded, and talking. Cheatham testified that Douglas did not appear to be under the influence of any drug and that he was able to answer questions in a coherent manner. He denied threatening or coercing him or promising him anything in order to get him to talk with him about the shooting. Before interviewing him, he provided Douglas with his *Miranda* and Article 38.22 warnings, which appeared on the audio recording of the interview. Cheatham

---

[7]This was reportedly the residence of the Reed brothers.

9

testified that Douglas seemed to understand the *Miranda* warnings that had been provided and that he knowingly, intelligently, and voluntarily agreed to waive his rights and speak with him. He also testified that Douglas was not forced, coerced, or enticed in any way. On cross-examination, Cheatham did not recall if he had told Douglas that he was recording his statement, but that the recorder was hanging around his neck and that a red light on it would be lit when it was recording. He also testified that he did not know what kind of medications Douglas had taken and that he had not spoken with a nurse or doctor prior to speaking with Douglas.

After the audio recording of the interview was played for the jury, Cheatham testified that Douglas said that he met Rossum and the other two men at the McDonald's on Estes around 3:00 or 4:00 in the afternoon. According to Cheatham, Douglas also said that it was Perry's idea to go to some apartments across the street from Signal Hill, but that Douglas directed them to Signal Hill. Douglas also stated that Perry was texting the whole time. In addition, Cheatham testified that Douglas confirmed that one of the cell phones recovered at the scene of the shooting belonged to him. Douglas once again stated that a person whom he did not know and who was riding alone in a car picked him up after the shooting and took him to the hospital. During the interview, Cheatham showed him a photograph of Skinner, and Douglas still denied that he was the person who picked him up and denied that Dashun Taylor (Dashun) was in the car. Cheatham acknowledged that during the interview, Douglas was on a blood pressure monitor and that a nurse came in at one point to check on him, apparently determined that Douglas was fine, and left.

Cheatham testified that at the time of the interview, he thought that Skinner was one of the shooters and Cheatham knew that there were two kinds of shell casings found at the scene. He

10

said that since that time he had interviewed Skinner, Dashun, Leonard Mitchell (another passenger in the Lincoln), and Ward. Based on these interviews, he obtained a search warrant for 104 Vesta and was present when it was executed. He testified that Deion and Torry were present at the house with their mother, grandmother, and two sisters when the search was conducted. In addition, he subpoenaed the phone records of the cell phone that Douglas identified as belonging to him. He explained that although Douglas purportedly gave him the pattern that would unlock the phone, when he tried to do so, the phone did not unlock.

Skinner testified that Ward was a friend of his and that she frequently allowed him to borrow her Lincoln. He said that around 3:00 p.m. on the day of the shooting, he, Douglas, Deion, Mitchell, and Ward were at Ward's apartment. While at the apartment, he overheard Douglas and Deion talking about hitting a lick.[8] He testified that he, Douglas, Deion, and Mitchell took Ward's Lincoln to Douglas' house, then they dropped Douglas off at the McDonald's. Douglas told them that he would be going to Signal Hill, so they went over there to wait on him, but he did not arrive at that time. They then went to Deion's house, where they picked up Torry. After it had grown dark, they picked up Dashun at a house on Johnson Street, and Torry tapped him on the shoulder and said that Douglas wanted them to pick him up behind the E-Z Mart. Torry was the only person in the car who had a telephone. Skinner testified that when they got to the E-Z Mart, Douglas was not there, so they parked next door at the feed store. After about thirty minutes, they drove to the Signal Hill Apartment Complex and parked behind it, where Torry and Deion got out of the car. Skinner said that Torry and Deion walked to a stairwell and that Torry used his cell phone. When

---

[8] "[H]itting a lick" means committing a theft or robbery.

11

Torry finished his conversation, he and Deion walked around the building. Skinner testified that after about a minute or two, he heard six or seven gunshots and drove the car around to see what was taking place. He stopped, saw Douglas running towards the car away from the orange and black Mitsubishi, and saw that he was shot. Douglas got in the Lincoln and told Skinner to take him to the hospital. As he was pulling away, Torry and Deion got in the car. Skinner testified that Douglas got in the front seat and that Torry and Deion got in the back seat. On the way to the hospital, Douglas told him to stop and let Torry and Deion out, which he did. Skinner said that when he pulled over to let them out, Douglas passed a black gun to them. He also testified that he had seen Deion with a .380 pistol earlier that day. He then took Douglas to the hospital, dropped him off at the entrance, and parked the car. On cross-examination, he testified that Torry and Deion wore gray hoodies that day.

Katrina Robertson testified that Douglas is the father of her three-year-old child, but that they have never lived together. She testified that Douglas and Skinner are friends and that she has seen them hang around together. She also testified that Douglas had asked her to talk with his former girlfriend and ask her to say in court that he neither knew the Reed brothers nor owned a gun.

Taylor was recalled and testified about the information obtained from a search of Douglas' cell phone, including the contact list, a log of the incoming and outgoing calls, and the incoming and outgoing text messages in the two hours before the shooting. He specifically testified about text messages sent between 7:59 p.m. and 9:49 p.m. on the night of the shooting between Douglas' cell phone and a phone number shown on the contact list of Douglas' cell phone as "reed." These

12

text messages revealed the details of a plan between the communicants to rob and kill Skinner and one of his passengers. They include instructions sent from Douglas' cell phone to "reed" directing him to be behind the E-Z Mart at a certain time, another which instructed "reed" to "pop" the driver of the auto in which he was riding as Douglas handled the passenger, another which instructed "reed" to "pop" the driver as soon as he gets out, and another which directed "reed" to "put dat [sic] bitch smooth to his head n [sic] pop his ass." This exchange also included a question from "reed" as to whether to park at Signal Hill or the feed store, another which asked, "How much he got" (with a reply of "$1000"), another sent from "reed" asking, "So when I hit the driver you hittin the passenger?" (with a reply of "yea").

## II.    Sufficient Evidence Supports Douglas' Conviction for Capital Murder

In his first and second points of error, Douglas asserts that there is insufficient evidence to support his conviction because (1) there is no evidence that he shot Rossum and (2) since the law of party culpability was not addressed in the application portion of the jury charge, neither the jury nor this Court can consider the evidence supporting a conviction under the law of parties.[9] Since his conviction may be upheld if there is sufficient evidence of guilt that he committed the murder as either the primary actor or as a party, we will treat these as one point of error.

Initially, we note that the Texas Court of Criminal Appeals has previously stated that even in the absence of an instruction on the law of parties in the application portion of the jury charge, a law of parties instruction in the abstract portion of the charge may be considered in a sufficiency review. *See Yzaguirre v. State*, 394 S.W.3d 526, 528–29 (Tex. Crim. App. 2013). In *Yzaguirre*,

---

[9]Douglas does not assert jury charge error. Rather, he only argues sufficiency of the evidence.

13

the court pointed out that it had previously discussed the Fifth Circuit case of *Brown v. Collins*[10] in *Malik v. State*.[11] *Yzaguirre*, 394 S.W.3d at 528–29. As here, the issue in *Brown* was sufficiency of the evidence. *Id*. at 529 (citing *Malik*, 953 S.W.2d at 238 (discussing *Brown*)). As in this case, the law of parties was contained in the abstract, but not in the application portion of the charge. *Id*. at 528–29 (citing *Malik*, 953 S.W.2d at 238). Although the evidence at trial was sufficient to establish Brown's guilt as a party, it was not sufficient to establish it as the primary actor. *Id*. at 529 (citing *Malik*, 953 S.W.2d at 238). Since a general instruction on the law of parties was contained in the charge, the Fifth Circuit rejected the appellant's argument that it could not be considered in a sufficiency of the evidence review. *Id*. (citing *Malik*, 953 S.W.2d at 238 n.3; *Brown*, 937 F.2d at 182). The Court of Criminal Appeals noted that *Brown* and the law of parties were two motivating factors in its formulating the "hypothetically correct jury charge" standard. *Id*. (citing *Malik*, 953 S.W.2d at 237–40). It then explained that "[t]he clear import of our discussion in *Malik* is that *Brown* correctly decided that the inclusion of the law of parties in the abstract portion of the jury charge was enough for the law of parties to be taken into account in a sufficiency review." *Id*.

In this case, Douglas concedes that the court charged the jury on the law of parties in the abstract portion of the charge and does not complain of any errors in that instruction. Therefore, we may take the law of parties into account in our sufficiency review. *Id*. Further, although not

---

[10]937 F.2d 175, 182 (5th Cir.), *en banc reh'g denied*, 945 F.2d 403 (1991).

[11]953 S.W.2d 234, 238 (Tex. Crim. App. 1997).

addressed in the court's discussion in *Yzaguirre*, if we are able to consider the law of parties in our sufficiency review of the jury's verdict, the jury could also consider this evidence.

### A.     Standard of Review

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trier of fact's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).  We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a measure the courts call a "hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."

15

TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011); *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). In determining whether an appellant is a party to an offense, we may consider "events before, during, and after the commission of the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). We may consider circumstantial evidence and look to the actions of the defendant showing an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

In this case, the indictment charged Douglas with intentionally causing the death of Rossum by shooting him with a firearm while Douglas was in the course of robbing or attempting to rob Rossum. Therefore, under a hypothetically correct jury charge, the State had to prove beyond a reasonable doubt that (1) Douglas or a person for whom he was criminally responsible (2) intentionally (3) caused the death of Rossum (4) by shooting him with a firearm (5) in the course of robbing or attempting to rob Rossum. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). On appeal, Douglas only challenges the sufficiency of the evidence that he (or a person for whom he was criminally responsible) caused the death of Rossum.

As seen above, the evidence showed that the bullet that caused the death of Rossum was fired from the AMT pistol that was recovered in the search of the house occupied by Deion and

16

Torry.  Skinner testified that Deion owned a gun and that he had overheard Douglas and Deion talking about hitting a lick earlier in the day.  Skinner also testified that Torry and Deion rode with him in the Lincoln to the area where the shooting occurred, exited the Lincoln, approached the Signal Hill Apartments from the rear, and then went around the side of the apartment building.  A short while later, Skinner heard six or seven gunshots, and when he drove around the building, Douglas, Deion, and Torry all got into the car together.  As he drove to the hospital, Douglas directed him to let Deion and Torry out of the car.  Perry testified that the two men in gray hoodies involved in the shooting came from behind the apartment building and that Douglas shook or bumped their hands.  Jackson testified that after he was shot, he heard Douglas direct the men in the hoodies to search his pockets and felt someone do so.  He also testified that after Douglas was shot, he exclaimed, "Man, you shot me," in a surprised tone of voice.  Both Perry and Jackson testified that it was Douglas who requested Rossum to take him back to the Signal Hill Apartments after they returned from Shreveport.  In addition, the text messages between Douglas and his contact, "reed," in the two hours before the shooting showed that Douglas and "reed" planned to not only rob Rossum and Jackson, but to shoot them as well.  Finally, Douglas' text instruction to "reed" to put the pistol against Rossum's head and "pop his ass" shows that the perpetrators intended to cause Rossum's death.

Under this evidence, we find that a rational jury could find beyond a reasonable doubt that a person for whom Douglas was criminally responsible intentionally caused the death of Rossum by shooting him with a firearm.  Since we have found that the evidence is sufficient to support the

17

jury's verdict under the law of parties, we need not consider Douglas' argument that the evidence was insufficient to convict him as a primary actor. We overrule this point of error.

## III. No Abuse of Discretion in Admitting the Testimony of Douglas' Former Girlfriend

In his fifth point of error, Douglas asserts that the trial court erred in admitting the testimony of Robertson, his former girlfriend. Douglas argues that the admission of the testimony violated Rules 403 and 504 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403, 504. The contested testimony concerned Robertson's testimony that Douglas had asked her to talk with his then-girlfriend to persuade her to say in court that he did not know the Reed brothers and that he did not own a gun. The trial court found that there was no privilege under Rule 504 since Robertson was not the spouse of Douglas, that the testimony was relevant, and that it should not be excluded under Rule 403 for unfair prejudice.

### A. Standard of Review

A trial court's decision to admit or exclude evidence is reviewed under an abuse-of-discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd). The trial court abuses its discretion only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Flowers*, 438 S.W.3d at 103. An evidentiary ruling will be upheld if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Flowers*, 438 S.W.3d at 103.

An objection under Rule 403[12] requires the trial court to balance the probative value of the evidence against its potentially prejudicial effect. *Montgomery*, 810 S.W.2d at 388–90. In reviewing the trial court's balancing determination, we will reverse its judgment "rarely and only after a clear abuse of discretion." *Id.* at 392 (quoting *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986)). Further, in our analysis, we are guided by what are known as the *Montgomery* factors:

> (1) how compellingly the evidence serves to make a fact of consequence more or less probable . . . ; (2) the potential the evidence has to impress the jury in some irrational but nevertheless indelible way; (3) the time the proponent will need to develop the evidence [(during which, the jury will be distracted from consideration of the indicted offense)]; and (4) the force of the proponent's need for this evidence to prove a fact of consequence [(that is, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute?)].

*Taylor v. State*, 93 S.W.3d 487, 506 (Tex. App.—Texarkana 2002, pet. ref'd); *Montgomery*, 810 S.W.2d at 389–90; *see Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); *Hartsfield v. State*, 305 S.W.3d 859, 873 (Tex. App.—Texarkana 2010, pet. ref'd).

### B. Analysis

In his statements to several police officers, Douglas repeatedly denied knowing the identity of Rossum's attackers, knowing Deion and Torry, or owning a gun. Skinner testified that Douglas knew Deion and Torry and that Douglas had a gun. Robertson's testimony that Douglas sought to have his then-girlfriend lie about these matters in court was strong evidence making these

---

[12]Rule 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

contested facts (i.e., his knowing the other attackers and his possession of a gun) more probable. In addition, since these issues were in dispute, the State needed Robertson's testimony to prove these consequential facts. We find the first and fourth factors support the probative value of the evidence and weigh heavily in favor of admissibility.

We also find that there is little potential that this evidence would impress the jury in an irrational manner. Rather, the evidence would be valuable to the jury in judging the credibility of the witnesses. We find this factor does not tend to show the danger of unfair prejudice and weighs in favor of admissibility. In addition, Robertson's entire testimony comprises slightly over ten pages out of a testimonial record that is over seven hundred pages. We find that there was little danger that the jury would be distracted from considering the indicted offense on this record. Therefore, we find that the trial court did not abuse its discretion in admitting Robertson's testimony under Rule 403.

In addition, Douglas contends that he had an expectation of privacy in his conversation with Robertson, who was the mother of his child, based on Rule 504. Rule 504 concerns confidential communications "made to the person's spouse while they were married." TEX. R. EVID. 504(a)(2). Rule 504 grants a privilege to a spouse "not to be called to testify for the state" in a criminal case. TEX. R. EVID. 504(b)(1). The Court of Criminal Appeals has held that the "privilege does not extend to matters occurring prior to the marriage." *Colburn v. State*, 966 S.W.2d 511, 514 (Tex. Crim. App. 1998). If a couple is not ceremonially married, then the accused must prove that a common law marriage existed at the time of the communication. *Id.* In this case, Douglas neither contended nor provided any evidence that he and Robertson were married

20

at the time of the communication. Although Robertson testified that Douglas is the father of her child, she indicated that she and Douglas had never lived in the same household together. The mantle of marriage confidentiality does not cover those who simply engage in sex with each other. Under these facts, we find that the trial court did not abuse its discretion in finding that no privilege existed and in admitting Robertson's testimony.[13] *See id.* at 515. We overrule this point of error.

## IV. Douglas Failed to Preserve His Point of Error Regarding the Text Messages

In his sixth point of error, Douglas asserts that the trial court erred in admitting the text messages from his cell phone. The text messages were obtained pursuant to a search warrant authorizing the search of his cell phone. On appeal, Douglas asserts that the search was illegal since the affidavit supporting the search warrant states, "Affiant is aware that previous attempts have been made to search for the requested information from this cell phone but that previous attempts were not successful due in large part to the fact that the cell phone was and remains password protected."[14] He argues that this shows that the warrant was issued based upon evidence

---

[13]Douglas also asserts in his brief that denial of this privilege to persons who were sexually intimate with a defendant and who have children from the relationship may be a denial of due process and equal protection. However, no objection based on due process or equal protection was made at trial. On appeal, the point of error "must correspond or comport with the objection made at trial." *Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)). Under Rule 33.1(a) of the Texas Rules of Appellate Procedure, an issue is not preserved on appeal unless the record shows that it was presented to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). Since the objection at trial does not correspond with the constitutional issue Douglas asserts on appeal, to the extent this point of error asserts these constitutional violations, nothing is preserved for our review. *See Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999); *In re S.A.G.*, 403 S.W.3d 907, 913 (Tex. App.— Texarkana 2013, pet. denied).

[14]It was previously noted that Douglas had purported to give police officers permission to look at the contents of his cell phone, and he purported to give them the password that would enable them to do so. However, they were unable

gained from an unlawful warrantless search, in violation of the Fourth Amendment and the Texas Constitution. *See* U.S. CONST. amend. IV; TEX. CONST. art. 1, § 9. We find that this point of error was not preserved.

"Preservation of error is a systemic requirement on appeal. If an issue has not been preserved for appeal, neither the court of appeals nor [the Texas Court of Criminal Appeals] should address the merits of that issue. Ordinarily, a court of appeals should review preservation of error on its own motion." *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009) (citations omitted). A motion to suppress evidence is a specialized objection to the admissibility of evidence. *Galitz v. State*, 617 S.W.2d 949, 952 n.10 (Tex. Crim. App. 1981). As such, a motion to suppress is required to meet the requirements of an objection. *Carroll v. State*, 911 S.W.2d 210, 218 (Tex. App.—Austin 1995, no pet.); *Mayfield v. State*, 800 S.W.2d 932, 935 (Tex. App.—San Antonio 1990, no pet.). To preserve an issue involving the admission of evidence for appellate review, the objection is required to inform the trial court why, or on what basis, the evidence should be excluded. *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009) (citing *Cohn v. State*, 849 S.W.2d 817, 821 (Tex. Crim. App. 1993) (Campell, J., concurring)).[15] In order to preserve a complaint on appeal, "all a party has to do . . . is to let the trial judge know what he wants [and] why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at

---

to get to the content of the cell phone using that information. It is likely that it was this attempt to which the affidavit made reference, not to some clandestine previous look at the data.

[15]*See also* TEX. R. APP. P. 33.1(a)(1)(A) (error is preserved only when record shows that "complaint was made to the trial court by a timely request, objection, or motion that . . . stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context").

a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827

S.W.2d 907, 909 (Tex. Crim. App. 1992). However, the objection must be sufficiently clear so

that opposing counsel and the trial court have an opportunity to address or correct the purported

deficiency. *Ford*, 305 S.W.3d at 533. For this reason, "shotgun objections" citing many grounds

for the objection without argument will not preserve points on appeal based on authority that is

only mentioned in the trial court without argument. *Johnson v. State*, 263 S.W.3d 287, 290 (Tex.

App.—Houston [1st Dist.] 2007, pet. ref'd, untimely filed); *Webb v. State*, 899 S.W.2d 814, 818

(Tex. App.—Waco 1995, pet. ref'd). Likewise, a form motion to suppress asserting multiple

grounds that are not subsequently asserted with argument at the suppression hearing will not

preserve those grounds on appeal. *See Johnson*, 263 S.W.3d at 289–90; *Morgan v. State*, No. 05-

94-01135-CR, 1996 WL 223551, at *4–5 (Tex. App.—Dallas Apr. 30, 1996, pet. ref'd) (not

designated for publication).[16] Also, an issue on appeal that does not comport with the objection

made at trial presents nothing for appellate review. *Ibarra*, 11 S.W.3d at 197; *Wright*, 154 S.W.3d

at 241.

 At the trial court, Douglas filed a generic motion to suppress alleging, in pertinent part,

II.

 The law enforcement officers unlawfully entered and intruded upon the privacy of this Defendant without lawful authority, without probable cause[,] and without a valid search warrant. The trespass and intrusion were followed by the search of a cell phone, above, and seizure of evidence without consent or lawful authority and without lawful search warrant or probable cause.

---

[16]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

III.

That the search of his cell phone was therefore illegal[,] and all the fruits of the search must be suppressed.

IV.

That if such search was upon a search warrant, the affidavit therefore did not allege sufficient facts to establish probable cause.

At the evidentiary hearing, Douglas offered no testimony or other evidence in support of these allegations. Further, the only objections Douglas asserted at trial were that there was insufficient probable cause for the issuance of the warrant, that the text messages were hearsay, and that the probative value of the texts was substantially outweighed by the danger of unfair prejudice. At no time during the hearing did Douglas contend that there had been a prior unlawful warrantless search of the cell phone or that the affidavit was based on information from a prior warrantless search. Since his issue on appeal does not comport with his objections made at trial, Douglas has presented nothing for our review. We overrule this point of error.

**V.     There Was No Abuse of Discretion in Admitting Douglas' Out-of-Court Statements**

In his third point of error, Douglas asserts that the trial court erred in admitting his out-of-court statement given to Cheatham. Douglas argues that the statement was the result of coercion, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.[17] *See* U.S. CONST. amends. V, XIV, § 1. In his fourth point of error, Douglas asserts that the trial court erred in admitting his out-of-court statements given to Hardee, Taylor, and Freeman, all law enforcement officers. Douglas argues that the statements were taken in violation of his Fifth Amendment right

---

[17]Douglas does not challenge the voluntariness of this statement under Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure.

24

to due process since he was not given his *Miranda* warning[18] and that the statements were involuntary.

## A.    Standard of Review

At a suppression hearing, "the trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witness' and the evidence presented." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) (quoting *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996)); *Simpson v. State*, 67 S.W.3d 327, 331 (Tex. App.—Texarkana 2001, no pet.). We view the record and all reasonable inferences drawn from it in the light most favorable to the trial court's ruling.

---

[18]Douglas did not preserve his due process issue. At the suppression hearing on his statement given to Hardee, Douglas pointed out that at the time of the statement, he had been shot and was in pain, and he argued that Hardee should have read him his rights since he could have made incriminating statements. The trial court overruled this objection, finding that he was not in custody, that it was not a custodial interrogation, and that, therefore, there was no requirement to advise him of his rights under Article 38 of the Texas Code of Criminal Procedure. At no time did Douglas argue that the failure to advise him of his rights was a violation of the Due Process Clause of the Fifth Amendment. In a suppression hearing, a general objection that could be founded on more than one legal argument will not preserve all the potential arguments on appeal. *See Resendez v. State*, 306 S.W.3d 308, 314–16 (Tex. Crim. App. 2009). "[W]hen the context shows that a party failed to effectively communicate his argument, the error will be deemed forfeited on appeal." *Id*. at 313. A defendant may claim his statement is not voluntary under three possible theories: (1) Article 38.22 of the Texas Code of Criminal Procedure; (2) *Miranda*; and (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Further, Article 38.22, Sections 2 and 3, expand the rights recognized in *Miranda*. *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2–3 (West Supp. 2015). Therefore, an objection that an officer should have read the accused his rights could be made under *Miranda*, Article 38.22, or both. Here, the trial court interpreted his objection as one lodged under Article 38.22.

At the suppression hearing regarding his statement given to Freeman, Douglas contended that his statement was not admissible under Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure since he was not read his rights. He also objected that he was in the hospital to be treated, that he could have made incriminatory statements, and that he did not know what he was saying. However, Douglas did not argue that the failure to advise him of his rights was a violation of the Due Process Clause of the Fifth Amendment. Since Douglas' issue on appeal does not comport with the objections he made at trial to the statements given to Hardee and Freeman, he did not preserve any error related to any violation of his due process rights under the Fifth Amendment for our review. *See Ibarra*, 11 S.W.3d at 197; *Wright*, 154 S.W.3d at 241. He did, however, preserve error regarding the voluntariness of his statements to Hardee and Freeman under Articles 38.21 and 38.22.

At the suppression hearing regarding his statement given to Taylor, Douglas contended that his statement was not admissible under Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure since he was not read his rights, and he also made objections under Rules 402 and 403 of the Texas Rules of Evidence. He did not argue that the failure to advise him of his rights was a violation of the Due Process Clause of the Fifth Amendment. Nor did he make any objection that his statement was not voluntary. Since his issues on appeal do not comport with the objections he made at trial to his statement given to Taylor, he did not preserve any error for our review.

25

*Simpson*, 67 S.W.3d at 331 (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). We give the trial court great deference in its decision to admit or exclude evidence and will not overturn its decision absent a flagrant abuse of discretion. *Delao*, 235 S.W.3d at 238 (citing *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006)). If the trial court did not make findings of fact, we will assume the trial court made implicit findings that support its ruling, as long as they are supported by the record. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005); *Simpson*, 67 S.W.3d at 332. When the defendant challenges the voluntariness of his statement, "the trial court must make an independent determination in the absence of the jury as to whether the statement was voluntarily made." *Simpson*, 67 S.W.3d at 332 (citing *Jackson v. Denno*, 378 U.S. 368, 380 (1964)); *see* TEX. CODE CRIM. PROC. ANN. art 38.22, § 6 (West Supp. 2015). Under the Fifth and Fourteenth Amendments, it is the State's burden to prove by a preponderance of the evidence that the statement was voluntary. *Id*. (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). However, this burden does not arise unless the defendant offers evidence raising a voluntariness question. *Id*. (citing *State v. Terrazas*, 4 S.W.3d 720, 724 (Tex. Crim. App. 1999)).

A statement is considered involuntary under the Due Process Clause "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice." *Alvarado*, 912 S.W.2d at

26

211 (citing *Alvarado v. State*, 853 S.W.2d 19 n.4 (Tex. Crim. App. 1993)); *Simpson*, 67 S.W.3d at 332. Due process claims of involuntariness involve "an objective assessment of police behavior." *Oursbourn*, 259 S.W.3d at 171. If the voluntariness claim is based on the defendant's state of mind, that is left to state law requirements. *Id.*

In Texas, Articles 38.21 and 38.22 govern the voluntariness inquiry. *Id*. at 172. Article 38.21, requires that any statement (whether custodial and non-custodial) be "freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21; *see Oursbourn*, 259 S.W.3d at 172. In addition, for custodial statements, Article 38.22 requires that the suspect's rights be "knowingly, intelligently, and voluntarily" waived. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b); *Oursbourn*, 259 S.W.3d at 172. Under Articles 38.21 and 38.22, "[a] confession given under the duress of hallucinations, illness, medications, or even a private threat, . . . could be involuntary." *Oursbourn*, 259 S.W.3d at 172 (citation omitted). However, while these factors are relevant, they do not make the statement involuntary unless they "rendered [the maker] incapable of making an independent, informed decision to confess." *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996) (citing *Nichols v. State*, 754 S.W.2d 185, 190 (Tex. Crim. App. 1988), *overruled on other grounds by Harris v. State*, 784 S.W.2d 5 (Tex. Crim. App. 1989)); *Simpson*, 67 S.W.3d at 332. We evaluate whether the statement was voluntary by examining the totality of the circumstances. *Delao*, 235 S.W.3d at 239 (citing *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997)).

**A. Douglas' Out-of-Court Statement to Cheatham**

At the suppression hearing on Douglas' statement given to Cheatham, the policeman testified that he took Douglas' recorded statement on May 17, 2012, at approximately 10:00 a.m. in a hospital room. He testified that before taking the statement, he read Douglas the warnings required under *Miranda* and Article 38.22 and that Douglas voluntarily and knowingly waived his rights. Cheatham testified that Douglas did not request an attorney until the end of the interview, at which time it ended. He also testified that Douglas was coherent, was able to ask and answer questions in a coherent fashion, and that he did not appear to be under the influence of any drugs or alcohol. On cross-examination, Cheatham acknowledged that it was possible Douglas had an IV attached, but he did not recall one. Cheatham also did not recall inquiring whether Douglas was taking pain medication, despite the fact that he was aware that Douglas had suffered a gunshot wound and that such injuries can be painful. He stated that he did not confer with medical personnel regarding Douglas' capability to then understand a conversation. Cheatham testified that at one point in the interview, he offered Douglas a drink of water, which he accepted. He also acknowledged that Douglas was in bed. Cheatham admitted that at the time of the interview, he thought that Douglas was one of the perpetrators of the crime and that he was looking for evidence to be used against him. He acknowledged that at one point in the interview, Douglas began yelling and cursing, that he became aggravated as they talked, and that Cheatham continued talking to Douglas even after Douglas exhibited his aggravation. He also testified that a nurse came in at

one point to check on Douglas and commented that he was experiencing tachycardia (which is a faster than normal heart rate), but that she did not stay very long.[19]

After listening to the recording of the interview, the trial court noted that although Douglas was in the hospital, there was no evidence that he was under the influence of any medications that would render his statement involuntary and that he had knowingly and intelligently waived his rights. These findings are supported by Cheatham's testimony and the recording admitted into evidence. Although Douglas argues that Cheatham engaged in a form of torture by provoking him so that his blood pressure went up to a dangerous point, this is not supported by the record.[20] On this record, we find that the trial court did not abuse its discretion in admitting Douglas' statement given to Cheatham. We overrule Douglas' third point of error.

**B.      Douglas' Out-of-Court Statements to Hardee and Freeman**

In support of his fourth point of error, Douglas argues that his statements to Hardee and Freeman were involuntary because they were given after he had been shot and while he was confined to a bed under a doctor's care. In addition, he faults the officers for failing to take steps to determine whether he was under the influence of any sort of pain killers or other drugs and for

---

[19]On the recording of the interview, a nurse is heard coming in and checking Douglas approximately twenty-seven minutes into the interview. She stays only a matter of seconds and does not return during the remainder of the forty-four-minute interview.

[20]Douglas contends that the Supreme Court condemned the use of torture in *Brown v. Mississippi*, 297 U.S. 278 (1936). We agree. However, in *Brown*, a group of men, accompanied by a deputy, repeatedly hanged and severely whipped the defendant until he confessed. *Id.* at 281–82. Nothing in this record approaches the use of similar extremely brutal measures. Douglas also cites *Townsend v. Sain*, 372 U.S. 293, 307–08 (1963), in which the Supreme Court held that a statement obtained after the defendant was administered a combination of drugs that acted as a "truth serum" was "not the product of a free intellect" and was inadmissible. *Id.* at 308. However, in that case, it was undisputed that the defendant was administered the drugs, and there was expert testimony regarding the effects of the drugs. *Id.* at 298–99, 301–02. In this case, there was no evidence that drugs of any kind had been administered to Douglas.

failing to obtain the approval of any of his medical providers before talking to him. As previously noted, at trial, Douglas either made specific objections under Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure, or the trial court interpreted his objection as being based on these statutes.[21] Therefore, we interpret Douglas' claim on appeal to be that his statements were involuntary because the law enforcement officers supposedly did not follow the obligations imposed by these statutes.

Hardee testified that when she took his statement, Douglas was not in custody and that he was not restrained in any way. She also testified that she did not threaten or coerce him in any way. She said that if he had said he did not want to talk with her, or if he had tried to leave, she would not have restrained him. Hardee also testified that at the time she talked with him, she did not know whether he was a victim, an offender, or a simple bystander and that there was no evidence indicating he might be a suspect. She stated that the purpose of talking with him was to discover how he got shot. At the time she spoke with him, she believed him to be no more than a shooting victim. She stated that he did not appear to be under the influence of narcotics and that he was willing and able to communicate comfortably. On cross-examination, she acknowledged that he was in a trauma room and that medical personnel had been treating him. In its ruling that the statement was admissible, the trial court found that Douglas was not in custody, but made no findings related to the voluntariness of the statement.

Freeman testified that when he arrived at the hospital, Douglas had been placed in custody on an unrelated warrant. He testified that he audiotaped the interview and that prior to asking any

---

[21]*See* supra note 16.

questions, he read Douglas his *Miranda* warnings, which was recorded. Freeman testified that Douglas seemed to understand each of the warnings and that he voluntarily spoke with him. He also testified that Douglas did not seem to be under the influence of drugs or alcohol and that he was able to answer his questions coherently. Freeman testified that he did not threaten or coerce Douglas or promise him anything to induce him to give the statement. On cross-examination, Freeman testified that the interview took place in the trauma room with hospital personnel around them. He did not recall if Douglas was hooked up to an IV, and he did not know if Douglas was under any kind of pain medication. He also testified that he talked with a nurse or doctor to receive permission from them to interview him. Freeman testified that he did not look at Douglas' wounds and that Douglas was able to turn his head to look at him. The recorded statement shows that Douglas was advised of his rights and waived them. It also supports Freeman's testimony that Douglas was able to give coherent answers to his questions. In relevant part, the trial court found that there was no evidence that Douglas was under any narcotic or pain medication and that he was coherent in his answers.

Both Hardee and Freeman interviewed Douglas within hours of his arrival at the hospital. Although he had been treated for his gunshot wounds, there is no evidence that he was under the influence of any medication, alcohol, or other drug that would have rendered him incapable of making an independent, informed decision to give his statements. In addition, there is no indication in the record that Douglas was in extreme pain or that he was coerced or threatened in any way. Therefore, the record supports the express and implied findings of the trial court that

31

these statements were voluntary.[22]  On this record, we find that the trial court did not abuse its discretion in admitting Douglas' statements given to Hardee and Freeman.  We overrule Douglas' fourth point of error.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice


Date Submitted:     April 20, 2016
Date Decided:      May 6, 2016

Publish

---

[22]While acknowledging there is no Texas authority, Douglas cites two cases from other jurisdictions that he asserts hold that an interrogation under hospital conditions can lead to the conclusion that the statement was involuntary.  *See Commonwealth v. Perry*, 379 A.2d 545 (Pa. 1977); *Vandegriff v. State*, 409 S.W.2d 370 (Tenn. 1966), *overruled on other grounds by State v. Anderson*, 937 S.W.2d 851 (Tenn. 1996)  However, in *Perry* the evidence showed that the defendant, who had been injured by a self-inflicted gunshot, had been given Demerol, a pain-killing drug and complained of pain and discomfort throughout the interview.  *Perry*, 379 A.2d at 546–47.  Further, the Pennsylvania court relied heavily on a state civil statute that prohibited the use of oral or written statements taken in a hospital within fifteen days of the injury.  *Id*. at 547.  The court reasoned that this evidenced the Legislature's "recognition that decisions made by injured persons in a hospital setting must be considered extremely suspect."  *Id.*  In *Vandegriff*, the defendant's statement was taken shortly after he arrived at the emergency room.  *Vandegriff*, 409 S.W.2d at 372.  The defendant had been in a severe automobile accident, and his treating physician testified that when he arrived at the emergency room, he appeared sleepy and groggy.  He also testified that the defendant had a line fracture of his skull and other head injuries, as well as a concussion.  *Id*.  In addition, there was evidence that he was under the influence of alcohol when the statement was taken.  *Id*. at 373.  Under these circumstances, the Tennessee court held that the statement was involuntary.  *Id.*  In this case, there is no evidence that Douglas was in pain, that he suffered any brain injury, that he had been given any pain-killing medication, or that he was under the influence of alcohol.  Further, we do not have a comparable statute barring the use of statements taken in hospitals.