

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-21-00138-CR

KENNETH EARL THOMAS, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 49503-B

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

A Gregg County jury convicted Kenneth Earl Thomas, Jr., of the murder of Kimberly Wallace and assessed a sentence of life imprisonment. On appeal, Thomas argues that (1) the trial court should have suppressed his recorded confession, (2) testimony from a firearms expert should have been excluded, (3) language in the jury charge constituted a comment on the weight of the evidence that compromised his right to remain silent, and (4) admission of gruesome autopsy photographs was erroneous.

We determine that the trial court did not err either by failing to suppress Thomas's recorded confession or by admitting ballistics evidence. We further find that Thomas's jury charge complaint is inadequately briefed and that he has failed to preserve his last point of error. As a result, we affirm the trial court's judgment.

## I.      Factual Background

Thomas and Wallace had been in a relationship for approximately seven years and had a four-year-old daughter, Kate.[1] The evidence at trial established that they were not living together and that their relationship was tumultuous. Charenda Jean Nevill, the public safety communication administrator for the Longview Police Department (LPD), testified that there were emergency calls involving the couple on June 6, 2018, and on March 30, June 20, July 6, and July 8, 2019. On July 26, 2019, two days before Wallace's murder, police were dispatched to an assault in progress. According to David Cheatham, the responding LPD officer, Wallace

---

[1]We will use pseudonyms to protect the identity of "any person who was a minor at the time the offense was committed." TEX. R. APP. P. 9.10(a)(3).

was crying, "her hair [wa]s in disarray," she had scratch marks on her body, and her cheek was swollen from what Cheatham believed was a slap to the face.

On July 27, Wallace's cousin, Shelita Medford, testified that she went out to eat with Wallace, Kate, and Wallace's teenaged children from another man, Jasmine and Jack. They stayed at the restaurant until 11:00 p.m., after which Medford returned home. That night, Wallace's friend Patrick Nigel Williams drove to Wallace's house for a visit, but Wallace believed it was too late to let him in. With Wallace's permission, Williams sat in his car outside of her home and smoked marihuana.

At approximately 2:15 a.m. on July 28, Williams asked Wallace for help to jump his car because it would not start. Wallace agreed, pulled her car up to his, and popped the hood. As Williams was in the process of jump starting his car in the dark, he heard what he initially believed was a "gasket . . . blowing under [his] hood." Williams went to investigate, saw Wallace lying on the ground, and concluded that she had been shot.[2] Williams saw someone leaving the scene toward an apartment complex but could not identify who had shot Williams since it was pitch dark. Scared and crying, he banged on Wallace's front door to inform Jasmine of what had happened and told her to call the police. Jasmine's frantic 9-1-1 call was played for the jury.

LPD Lieutenant Charles Ryan Rocket appeared at the scene to find Wallace lying in the road in a large pool of blood between two cars. Dusty Paul Seay, an LPD sergeant, collected six shell casings at the scene. According to Armando Juarezortega, an LPD detective, Jack reported

_____

[2]Wallace's neighbors, Earnest and Tonia McNeary, said they heard gunshots at around 3:15 a.m.

3

that Thomas might have committed the crime. After speaking with Thomas's friend John Lewis Bean, Juarezortega believed Thomas was the proper suspect.

Bean testified that he and Thomas became acquainted after they both served time in jail. After their release, they each rented an apartment at the Courtyard Apartments in Longview, Texas. Bean said that Thomas called him on the day of the murder at 6:00 or 7:00 a.m. and offered him twenty dollars if Bean would pick him up from the Days Inn hotel. Bean accepted and dropped Thomas off at the intersection of El Paso and Lilly Streets, near Broughton Park. That afternoon, Thomas asked Bean to go to his apartment to retrieve his clothes, but Bean refused because Thomas "explained to [Bean] what he had done." According to Bean, Thomas said, "I can't go back to my apartment because they [are] looking for me. I did it. . . . I killed her last night." Bean assumed that Thomas was referring to Wallace. He added that he had seen Thomas in possession of a beige-colored gun before the shooting.

Kirby Deloach, an LPD officer, testified that they collected the weapon from Thomas after an officer-involved shooting at Broughton Park. Juarezortega testified that Thomas "took off running" as he and other officers tried to arrest him, and then Thomas "started firing at [officers]," who "returned fire." Juarezortega said that "there were a lot of shots that were fired by Mr. Thomas" and that he could "hear the bullets passing close by." Thomas yielded when he was shot in the buttocks by an officer, and his tan .40 caliber Taurus was collected as evidence.

After his arrest, Thomas was admitted to Good Shepherd Medical Center at 9:49 p.m. for treatment due to his gunshot wound, was administered 50 micrograms of fentanyl at 10:29 p.m., was discharged at 11:58 p.m., and was released to police custody. After a custodial

4

interrogation, which began immediately after his release from the hospital, Thomas was booked into the Gregg County Jail.

According to Ashley Christina Hukill, one of the jailers who was with Thomas, Thomas said, during the booking process, "Yeah, I did what I did." Thomas made similar statements in recorded jailhouse calls. In the first call to an unidentified woman, Thomas again said, "I did what I done" and asked the woman to tell Kate when she was older that it was because "her mama was not right in trying to keep [him] from her." In another call to an unidentified man, Thomas said he was "going out with a blaze" and that the only thing he "hate[d]" was that he "didn't get that nigga too." Thomas added, "I don't know who that nigga was that was there. . . . He looked me dead in the eyes and took off running." While making gunshot noises, Thomas said, "I lit that bitch up."

Devon Fuller, a deputy at the jail, testified that Thomas wanted to show Fuller a song he wrote about his case. Fuller said that Thomas had a piece of paper with lyrics on it, which he photographed. The photograph, which was admitted into evidence without objection, showed that the title of the song was "I got murder on my mind." Fuller said that Thomas rapped the following lyrics from the paper:

> 8 SHOTS TO DAT HOE HEAD BUST HER BRAIN
> NOW IM FACEIN ME A LIFE SENTENCE IN DIS BITCH
> I AINT TRIPPIN ON IT THO DAWG I DNT GIVE A SHIT
> THE ONLY THING THAT I HATE I DIDN'T GET DAT NIGGA
> . . . .
> SHE SHOULDN'T NEVER USE MY DAUGHTER IN THE BEGINNING YALL
> . . . .
> LUCKY THE LAWS GOT ME OR DAT NIGGA HE'LL BE DEAD . . . .

5

Erin Carney, M.D., a forensic pathologist, performed Wallace's autopsy. She testified that Wallace had gunshot wounds on her left occipital scalp, the back of her head, and the left side of her chest and that another bullet had grazed her left arm. According to Carney, because there was no evidence of a close-range shot, the weapon must have been fired from a distant or intermediate range. To document her findings, Carney took photos during the autopsy that were shown to the jury.

Nathan Tunnel, a firearms and toolmarks examiner at the Texas Department of Public Safety Crime Laboratory in Tyler, testified that he analyzed bullets retrieved from Wallace's body during Carney's autopsy and compared them with the Taurus collected from Thomas. According to Tunnel, "[T]wo bullets were identified as having been fired from the Taurus pistol. . . . And then two remaining bullets were inconclusive." Tunnel's conclusions were reviewed and verified by another examiner.

After hearing this evidence and watching Thomas's custodial interrogation, the jury convicted Thomas of Wallace's murder.

## II.     The Trial Court Did Not Err by Failing to Suppress Thomas's Recorded Confession

At a pretrial hearing, counsel moved to suppress the recorded statement on the ground that it was involuntary because Thomas was under the influence of pain medication administered by the hospital to treat injuries he received during "a gun battle with the police." In his first point of error on appeal, Thomas argues that the trial court erred by failing to suppress his recorded confession. We disagree.

6

## A. Thomas Moves to Suppress the Recorded Confession

Thomas did not secure a pretrial ruling on his motion to suppress. At trial, it was undisputed that Thomas received a 50-microgram dose of fentanyl, which Carney believed could affect someone for at least two to three hours. Carney classified fentanyl as an artificial opiate depressant that could compromise the ability to think and reason. Although Carney could not say whether the drug would affect someone's ability to provide informed consent, she testified that she would be reluctant to take informed consent from someone under the influence of drugs.

Dustin Ashworth, an LPD detective, testified that he conducted a recorded interview of Thomas on July 28 after reading Thomas his *Miranda*[3] rights. As Ashworth was about to discuss the interview, Thomas objected and argued that the confession should be excluded because "[t]he State ha[d] not complied with Article 38.22, Section 3," which required a knowing, intelligent, and voluntary waiver of rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2). Alternatively, Thomas requested that the jury be allowed to watch the entirety of the recorded confession to determine whether Thomas's waivers were voluntary.

Ashworth testified that Thomas admitted to shooting Wallace. After that testimony, the confession was shown to the jury. The recording showed that Thomas was brought into the interrogation room, where he lay on the floor while waiting for Ashworth to arrive. When Ashworth came into the room, Thomas asked if he could remain on the floor. Ashworth acknowledged that Thomas had more pain while sitting and allowed him to stay on the floor during questioning. Yet, when asked if he was administered pain medication, Thomas

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

7

responded, "I don't think so." He then read Thomas his *Miranda* rights, which Thomas waived. On the recording, Thomas appeared to initially answer questions coherently. Yet, he appeared to ramble at points and had difficulty finishing sentences, which could have been because he was in pain, was exhausted, or—as Thomas suggested—was under the influence of fentanyl.

When asked about the shooting, Thomas acknowledged that he was incriminating himself. Ashworth told Thomas that they already had evidence suggesting that he was the perpetrator and just wanted to hear his side of the story. Indicating his understanding of the consequences of his actions, Thomas said, before giving his confession, "I'm dead anyway. They're fixing to hang me." He explained that he was deeply upset because Wallace would not allow him to talk to Kate and became angry when he learned that Kate was allowed to be around another man. Thomas told Ashworth that he took a cab to Wallace's house, saw Williams raise his car hood after his car would not start, witnessed Wallace drive her car up to Williams's, and watched as she stepped out of the vehicle. Thomas admitted that he walked up to the scene and indicated that he shot Wallace by saying, "[P]ow, pow, pow, pow." Thomas said that Williams did not see or hear him but took off running. After the shooting, Thomas testified that he walked away and called a cab, went to a Days Inn, and called Bean.

After the confession, the video showed that Thomas began bleeding from his wound. When Ashworth exited the room, Thomas urinated into a cup and appeared to be asleep on the floor. Because Carney had testified that she would be concerned that a person was "altered" if engaged in conversation while lying down on the floor or urinating in the room, Thomas argued that his conduct during the interview suggested that he was still under the influence of fentanyl.

8

Yet, Ashworth testified that, while Thomas was in distress from pain, his speech was not slurred, and he appeared normal to Ashworth.

**B.    Applicable Law Related to Thomas's Request and the Standard of Review**

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." *Douglas v. State*, 489 S.W.3d 613, 631 (Tex. App.—Texarkana 2016, no pet.) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.21). "When the defendant challenges the voluntariness of his statement, 'the trial court must make an independent determination in the absence of the jury as to whether the statement was voluntarily made.'" *Id.* (quoting *Simpson v. State*, 67 S.W.3d 327, 332 (Tex. App.—Texarkana 2001, no pet.)).

A question of voluntariness is raised, as it was here, when it is litigated in some manner at trial. *Oursbourn v. State*, 259 S.W.3d 159, 176 (Tex. Crim. App. 2008). "A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories:   (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas Confession statute); or (3) the Due Process Clause." *Id.* at 169 (footnotes omitted) (citations omitted).

Thomas's briefing cites the Due Process Clause.   "Under the Fifth and Fourteenth Amendments, it is the State's burden to prove by a preponderance of the evidence that the statement was voluntary." *Douglas*, 489 S.W.3d at 631 (citing *Simpson*, 67 S.W.3d at 332; *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App.

9

1995)).  However, "[a] statement is considered involuntary under the Due Process Clause 'only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice.'"  *Id.* (quoting *Alvarado*, 912 S.W.2d at 211).  "Due process claims of involuntariness involve 'an objective assessment of police behavior.'"  *Id.* (quoting *Oursbourn*, 259 S.W.3d at 171).  "If the voluntariness claim is based on the defendant's state of mind, that is left to state law requirements."  *Id.* (citing *Oursbourn*, 259 S.W.3d at 171).  Because Thomas's arguments question only his state of mind as the result of the administration of fentanyl, and not police conduct, we turn to state law requirements.

In relevant part, Article 38.22 states:

Sec. 3.  (a)  No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

. . . .

(2)  prior to the statement but during the recording the accused is given the [proper] warning[s] . . . and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

. . . .

Sec. 6.  In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions.  If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made . . . . Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was

10

voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof.

TEX. CODE CRIM. PROC. ANN. art. 38.22. The Texas Court of Criminal Appeals has stated that the sequence of events contemplated by Section 6 is as follows:

(1)     a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own);

(2)     the trial judge holds a hearing outside the presence of the jury;

(3)     the trial judge decides whether the confession was voluntary;

(4)     if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary;

(5)     if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction.

*Oursbourn*, 259 S.W.3d at 175.

With respect to step three, of which Thomas complains, "the trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witness' and the evidence presented." *Douglas*, 489 S.W.3d at 631 (quoting *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) (quoting *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996)). "[A] confession given under the duress of . . . medications . . . could be involuntary." *Id.* at 632 (citing *Oursbourn*, 259 S.W.3d at 172). While evidence that a person was under the influence of drugs or medication is relevant, it "do[es] not make the statement involuntary unless [it] 'rendered [the maker] incapable of making an independent, informed decision to confess.'" *Id.* (quoting *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996)). "We evaluate whether the statement

11

was voluntary by examining the totality of the circumstances." *Id.* (citing *Delao*, 235 S.W.3d at 239).

When reviewing a motion to suppress, we give "almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor." *Cochran v. State*, 563 S.W.3d 374, 378 (Tex. App.—Texarkana 2018, no pet.). Because this is such an issue, "[w]e view the record and all reasonable inferences drawn from it in the light most favorable to the trial court's ruling." *Douglas*, 489 S.W.3d at 631. Where, as here, "the trial court did not make findings of fact, we will assume the trial court made implicit findings that support its ruling, as long as they are supported by the record." *Id.* (citing *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005)).

**C.     The Decision to Overrule Thomas's Suppression Motion Was Proper**

Even assuming that Thomas was under the influence of fentanyl during Ashworth's questioning, that "fact alone is not . . . sufficient to render his confession involuntary." *See Garcia v. State*, 919 S.W.2d 370, 387 (Tex. Crim. App. 1994) (per curiam) (op. on reh'g); *see also King v. State*, 585 S.W.2d 720 (Tex. Crim. App. [Panel Op.] 1979) (holding that heroin taken on the day of confessing did not render confession involuntary); *Saldana v. State*, 59 S.W.3d 703, 712 (Tex. App.—Austin 2001, pet. ref'd) (holding trial court did not abuse its discretion in admitting recorded confession when the blood test revealed that appellant had ingested .3 milligrams of cocaine even though appellant told police he was "not in [his] right mind" because he took "a lot of drugs and . . . had been drinking"); *Pace v. State*, 986 S.W.2d 740 (Tex. App.—El Paso 1999, pet. ref'd) (holding confession not involuntary even though

defendant's blood alcohol level was at .16 at time of arrest). This is because, in spite of Thomas's alleged intoxication, the trial court could have determined that he was still capable of making an independent, informed decision to confess. *See Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

The record supported the conclusion that Thomas was lying on the ground because he had been shot in the buttocks. The trial court could have easily determined that what Thomas argued were signs of intoxication were merely signs of pain or exhaustion. Viewing the recording in the light most favorable to the trial court's implied findings, Thomas appeared to understand and waive his *Miranda* rights, answered Ashworth's questioning coherently, described the events of each day of the week leading up to the offense in chronological detail, and provided his explanation for Wallace's murder. Before confessing, Thomas pressed Ashworth to reveal what evidence LPD had gathered against him. Importantly, Thomas acknowledged both that he was incriminating himself prior to giving his confession and that he understood the consequences and seriousness of his actions by expressing that he was "dead anyway."[4] Giving the trial court the appropriate deference afforded in its determination of historical facts, we cannot conclude that the trial court erred by finding Thomas's confession voluntary.

Moreover, ample evidence would have supported the jury's verdict of guilt in the absence of Thomas's confession. The jury heard that police officers had responded to six emergency

---

[4]The trial court could have also determined that Thomas's decision to urinate into a cup after giving his confession while left alone in the interrogation room for several minutes was not so unreasonable as to suggest that he lacked his typical mental faculties. The recording shows that Thomas had been previously left alone in the room for a considerable amount of time, that he muttered to himself that he just could not "hold it" anymore, and that he apologized for the emergency act when Ashworth returned to the room.

calls involving Wallace and Thomas from June 2018 to the date of the murder. Two days before the murder, Cheatham testified that Wallace had been assaulted. Before Thomas's recorded confession was admitted, Bean testified that Thomas confessed to killing a woman, whom Bean assumed was Wallace. They jury also heard evidence that bullets from the gun retrieved from Thomas after the officer-involved shooting matched the bullets gathered from Wallace's body during her autopsy. In jailhouse calls, Thomas made gun noises while describing the shooting and attempted to justify his acts by stating that Wallace was trying to keep Kate from him. Finally, the jury reviewed the lyrics of Thomas's song, titled "I got murder on my mind," which described how Thomas shot Wallace and his reason for doing so.

For all the foregoing reasons, we overrule Thomas's first point of error.

## III. The Trial Court Did Not Err by Admitting Ballistics Evidence

In his second point of error, Thomas argues that the trial court should have excluded Tunnel's testimony because the scientific evidence offered by Tunnel was not reliable. After reviewing this record, we conclude that the trial court's decision to admit Tunnel's testimony was not an abuse of discretion.

### A. Thomas Objected to the Reliability of Tunnel's Methodology

After providing his educational background and qualifications, Tunnel testified that he had been qualified as an expert witness in the field of ballistics over forty times. In explaining his methodology, Tunnel testified as follows:

> During the manufacturing process of a firearm, you get unique characteristics onto that firearm that's just been individualized to that firearm. And then when we are making identifications, we're making opinion statements based on the level of agreement between those reproduced characteristics that are found

14

throughout the life of the firearm, assuming it hasn't been changed in some way. You're making statements about the reproducibility and the way that those patterns match.

. . . .

During the actual manufacture process, you get microscopic impurities in the metal that, through the course of manufacture, they remain with that firearm, so that from then on, the harder metal -- as it fires a cartridge, the harder metal of the firearm creates marks in the softer metal of the ammunition components. And that's where you get the reproduced pattern. So it would be similar to fingerprints.

During voir dire, Tunnel testified that he would be making "an opinion based on [his] training and experience." He clarified that there was no statistical model to apply to his result and no "statistical probability along with [his] opinion." Prior to Tunnel's ballistics testimony, Thomas made the following objection: "It doesn't meet the requirements of expert testimony, as to scientific evidence. It's not reproducible, doesn't have a statistical model that can predict an error rate, and it's nothing more than conjecture." The trial court overruled Thomas's objection after noting that Tunnel's "field is recognized."

## B. Admitting Tunnel's Testimony Was Not an Abuse of Discretion

"The admission of expert testimony is reviewed on appeal for an abuse of discretion." *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). An "expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. "[A] trial court's responsibility under . . . [Rule] 702 is to determine whether proffered scientific evidence is

15

sufficiently reliable and relevant to assist the jury." *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000) (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

"The proponent of the scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable." *Id.* "This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question." *Id.* (citing *Kelly*, 824 S.W.2d at 573). Non-exclusive factors that might influence a trial court's determination of reliability include:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained, (2) the existence of literature supporting or rejecting the underlying scientific theory and technique, (3) the clarity with which the underlying scientific theory and technique can be explained to the court, (4) the potential rate of error of the technique, (5) the availability of other experts to test and evaluate the technique, (6) the qualifications of the expert(s) testifying, and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Sexton v. State*, 93 S.W.3d 96, 100 (Tex. Crim. App. 2002).

"[T]oolmark theory for the identification of fired bullets enjoys widespread acceptance." *Id.* Tunnel testified that there were "several different studies" supporting his methodology and explained the underlying scientific theory and technique with clarity.[5] When asked about his personal error rate and the error rate of the field, Tunnel responded, "For me personally for my proficiency test, it's a zero percent error rate. And the field as a whole, there are several

---

[5]Although not specifically identified at trial, such literature has been referenced by Texas courts. *See Sexton*, 93 S.W.3d at 100 (citing VINCENT DIMAIO, GUNSHOT WOUNDS: PRACTICAL ASPECTS OF FIREARMS, BALLISTICS AND FORENSIC TECHNIQUES 31 (1st ed. 1992); J.S. HATCHER ET AL., FIREARMS INVESTIGATION IDENTIFICATION AND EVIDENCE 310 (1957) (revision of Hatcher's *Textbook of Firearms Investigation, Identification, and Evidence*, published in 1935)).

different studies where they have calculated the error rates."[6] Tunnel also testified that his results were independently verified by another examiner. As for his qualifications, Tunnel showed that he was employed as a forensic scientist with the TDPS Crime Laboratory since 2010, was a member of the Association of Firearm and Tool Mark Examiners (AFTE) since 2011, had testified as an expert witness in his field over forty times since 2012, had published an article in the AFTE journal titled "Firing Cartridge Cases in Seemingly Inoperable Handguns: A Course of Logic," attended many training courses, and underwent annual proficiency testing. During direct examination, Tunnel also showed that he had correctly applied the toolmark theory of identification using the bullets retrieved from Wallace's autopsy and the Taurus recovered from Thomas.

Based on this record, we conclude that the trial court did not abuse its discretion by determining that Tunnel's expert testimony was reliable and should be admitted.[7] Consequently, we overrule Thomas's second point of error.

## IV. Thomas's Jury Charge Complaint is Inadequately Briefed

Next, Thomas complains of one sentence contained in the trial court's jury charge. The charge contained the following instruction under the heading "Evidence of Prior Convictions by Defendant":

> You are further instructed that certain evidence was admitted in evidence before you in regard to the Defendant's having been charged and convicted of offenses other than the one for which he is now on trial. Such evidence cannot be considered by you against the Defendant as any evidence of guilt in this case.

---

[6]Tunnel was not asked to clarify the error rates discussed in those studies.

[7]Also, in light of the evidence of Thomas's guilt recited above, we fail to see how Thomas could have been harmed by the admission of Tunnel's testimony.

*You may only consider the said evidence in determining the credibility of the Defendant and for no other purpose.*

(Emphasis added). At the charge conference, Thomas objected to the italicized sentence on the ground that his credibility was not at issue because he did not testify. The trial court noted that the jury had heard Thomas's recorded confession, which included information about his prior convictions, and found that the italicized sentence was necessary to prevent the jury from considering prior convictions for all purposes. As a result, the trial court overruled Thomas's objection and submitted the limited instruction.

On appeal, Thomas argues that the trial court's italicized sentence constituted a comment on the weight of the evidence "[t]hat [ran] counter to the Fifth Amendment right and counter to the trial court's opposite instruction in the charge of the defendant's right to remain silent."[8] Other than these conclusory statements, Thomas provided no substantive analysis and cited no applicable authority in support of the statements.

To avoid forfeiting a legal argument for inadequate briefing, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *Taylor v. State*, 558 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, no pet.) (quoting TEX. R. APP. P. 38.1(i)). Thomas's brief fails to explain how or why the trial court's limiting instruction constituted a comment on the weight of the evidence and how

---

[8]Under the heading "Defendant's Right to Remain Silent," the trial court submitted the following instruction:

> The defendant has a constitutional right to remain silent. The defendant may testify on his own behalf. The defendant may also choose not to testify. The defendant's decision not to testify cannot be held against him and it is not evidence of guilt. You must not speculate, guess, or even talk about what the defendant might have said if he had taken the witness stand or why he did not. The foreperson of the jury must immediately stop any juror from mentioning the defendant's decision not to testify.

18

the instruction impacted his right to remain silent. He has also failed to provide any applicable caselaw where a comment on the weight of the evidence was deemed to have impacted a defendant's right to remain silent. "Because the Texas Court of Criminal Appeals has emphasized that an appellate court has no obligation to construct and compose issues, facts, and arguments for an appellant, encompassed within Rule 38.1 is the party's task of explaining or discussing why an argument has substance." *Id.* (citing *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017)). As a result, this Court will not create Thomas's argument for him.

In addition, an issue is inadequately briefed when an "appellant does not address the question of whether the alleged error . . . was harmless." *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000). Although Thomas set forth the standard for analyzing harm caused by jury-charge error, he provided no harm analysis other than a conclusory statement that the harm was egregious. Such a conclusory statement failed to show how Thomas was harmed by the italicized sentence in light of the overwhelming evidence of guilt recited above.

"To avoid forfeiture, a party must provide substantive analysis by applying the law to the facts." *Taylor*, 558 S.W.3d at 218. "A brief that fails to apply the law to the facts does not comply with Rule 38.1 and presents nothing for review." *Id.* (citing *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003)). We overrule Thomas's third point of error because we find it inadequately briefed.

## V. Thomas Failed to Preserve His Last Point of Error

Next, after Carney testified about the injuries she discovered during Wallace's autopsy, the State proffered Exhibit 34, a dvd containing multiple autopsy photographs. Thomas argues

19

that the trial court erred (1) by admitting the gruesome autopsy photographs and (1) by overruling his global relevance objection because some of the autopsy photographs were irrelevant. We conclude that none of Thomas's complaints are preserved for our review.

### A. Thomas Raised No Argument About Gruesomeness or Unfair Prejudice at Trial

When the State proffered Exhibit 34, Thomas immediately asked the trial court to approach the bench. Although there is no record of Thomas's objection at the bench, the trial court overruled an objection to the photographs after finding "that they [were] not cumulative, [and] that they [were] relevant." On appeal, Thomas discusses certain photographs contained within the exhibit and argues that those specific photographs were gruesome and should have been excluded because they were unfairly prejudicial and introduced merely to inflame the passions of the jury. The State argues that Thomas's appellate argument does not comport with his objection at trial. We agree.

A "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005). As stated in *Resendez v. State*, 306 S.W.3d 308 (Tex. Crim. App. 2009),

> Rule 33.1(a) of the Texas Rules of Appellate Procedure provides that a complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."

*Id.* at 312 (quoting TEX. R. APP. P. 33.1(a)(1)(A)).

20

"The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Id.* As explained in *Resendez*,

> Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."

*Id.* at 312–13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

Thomas complains of the gruesomeness of the autopsy photographs and argues that, as a result, their probative value was outweighed by the danger of unfair prejudice. Yet, the record does not show that Thomas objected to the gruesomeness of the photographs or any resulting unfair prejudice.[9] Instead, Thomas complained only of the relevance and cumulative nature of the autopsy photographs. As a result, Thomas's argument on appeal does not comport with his complaint at trial. Because a reviewing court should not address the merits of an issue that has not been preserved for appeal, we overrule Thomas's complaints about the alleged gruesomeness of and unfair prejudice resulting from certain autopsy photographs. *See Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

---

[9]*See Amador v. State*, 221 S.W.3d 666, 675 (Tex. Crim. App. 2007) (It is the "appellant's burden to bring forward a record on appeal sufficient to show that the trial court erred.").

21

### B. Thomas's Global Objection Did Not Preserve a Complaint About Specific Photographs

Autopsy photographs illustrate the results of an examination of the body, are relevant to the manner of death, and are "highly probative to show the full extent of the injuries appellant inflicted on the victim." *Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007); *see Ripkowski v. State*, 61 S.W.3d 378, 393 (Tex. Crim. App. 2001). On appeal, Thomas does not argue that all of the autopsy photographs contained on the dvd are irrelevant, but instead argues that photographs that either showed Wallace completely naked or her sectioned skull were irrelevant to the State's burden of proof on any element in the indictment.[10] The State argues that Thomas only made a global objection to the relevance of the autopsy photographs at trial. We agree that nothing in the record shows that Thomas complained of the specific photographs he identifies in his appellate argument.

A general objection to the evidence as a whole, which does not point out specifically the objected-to portion, is properly overruled if any part of that evidence is admissible. *See Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009) (citing *Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. [Panel Op.] 1980) (op. on reh'g) (concluding that the dissenting opinion correctly stated the rule that, "[w]hen evidence is admitted a part of which is admissible and a part of which is not, it is incumbent on the party objecting to the admissibility of the evidence to specifically point out what part is inadmissible to preserve the alleged error")). Here, the record does not show that Thomas raised anything other than a global relevance

---

[10]Thomas's argument is that "[t]he cause of death was described, and it did not include any narration about sectioning the skull or the need for a full frontal nude picture of the corpse."

22

objection to the entirety of Exhibit 34. Such an objection was insufficient to preserve his appellate complaint about specific photos that showed either Wallace completely naked or her sectioned skull. *See Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009). This is because "[w]hile it might be conceded that appellant's objection sufficiently stated grounds for the objection, it did not identify what was objected to." *Id.* (citing *Hernandez*, 599 S.W.2d at 617 (op. on reh'g)). As a result, "[t]he trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part." *Id.*; *see Reyna v. State*, 168 S.W.3d 173, 178 (Tex. Crim. App. 2005) (quoting *Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992), *overruled on other grounds by Maxwell v. State*, 48 S.W.3d 196, 200 (Tex. Crim. App. 2001)).

We conclude that Thomas's global objection to Exhibit 34 failed to preserve his complaint about the relevance of specific photographs included within the exhibit. Moreover, "if evidence is offered and challenged which contains [both admissible and inadmissible evidence], the trial court may safely admit it or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection." *Id.* (quoting *Jones*, 843 S.W.2d at 487).

Because we find that Thomas failed to preserve his appellate complaints about the autopsy photographs, we overrule Thomas's last point of error.

## VI.    Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:    July 12, 2022
Date Decided:      August 3, 2022

Do Not Publish

24